**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN MORRIS ANDERSON** | : | |
| | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | **No. 22-cv-5084** |
| | : | |
| | : | |
| **J.P. MORGAN CHASE BANK** | : | |
| | : | |

<u>**MEMORANDUM**</u>

**Perez, J**                                                                              **March 29, 2024**

*Pro se* Plaintiff John Morris Anderson initiated this action in federal district court against

Defendant J.P. Morgan Chase Bank alleging that the bank engaged in racial discrimination,

profiling, and defamation, all of which interfered with his business relationships and caused him

pain and suffering. This matter is before the Court on Defendant's motion to dismiss the suit

pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rule of Civil Procedure 7.1. Upon

careful consideration of the Complaint,[1] briefing by the Parties, and for the reasons set forth below,

this Court will grant Defendant's motion.

I.       **BACKGROUND**

On April 14, 2022, Plaintiff John Morris Anderson received a phone call from Charles

James, whom Plaintiff describes as a "personal friend" and "business associate." Plaintiff also

refers to Mr. James as a "disabled person," but provides no further specifics to this end. ECF No.

---

[1] Plaintiff's Complaint is not a model of clarity, though Plaintiff does present substantial factual background. As Plaintiff is proceeding *pro se*, the Court has construed his allegations liberally. *Higgs v. Att'y Gen.,* 655 F.3d 333, 339 (3d Cir. 2011). The Court has had to draw many inferences, including some rather tenuous ones, connecting Plaintiff's assertions in order to produce a coherent theory of the case.

1 at ¶ 1-2. Plaintiff avers that Mr. James asked him for advice on opening a personal bank account in order to deposit a $62,000 check he was awarded from a lawsuit.  Plaintiff Anderson suggested to Mr. James that he open an account at the JP Morgan Chase Bank branch ("Chase Bank") located in the Graduate Hospital neighborhood of Philadelphia, where both men resided. Plaintiff labels this interaction between the men as "financial advisory services," for which he did not charge Mr. James. Plaintiff alleges that Mr. James had a prior outstanding debt owed to him, so it was agreed that Mr. James would pay Plaintiff $7,000 once the bank account was opened. *Id.* at 1-3.

Plaintiff accompanied Mr. James to the Chase Bank, introducing himself to a bank representative as Mr. James' financial advisor, and presenting his own Chase Bank debit card. After Mr. James' account was initiated, Plaintiff requested that the teller transfer $7,000 of Mr. James' deposit to Plaintiff's checking account. The teller explained that he was unable to transfer funds from Mr. Charles' new account to Plaintiff's checking account for five business days, and that no checks could be cashed during that time period.  *Id.* at  3.

Instead, Mr. James wrote a $7,000 check to Plaintiff with one of the temporary checks issued to him. On April 20, 2022, Mr. James attempted to deposit the check into a different bank account he had with PNC Bank. Presumably, Plaintiff believed that five business days had lapsed, however Defendant argues that "five business days from April 14, 2022 would have been April 21, 2022." ECF No. 10 at 3. Two days after his attempted deposit, Chase Bank returned the check as unpaid for "miscellaneous reason." *Id.*

Plaintiff alleges that Mr. James informed him that he had received a call from a Chase Bank representative a few days after opening the account, wherein the caller suggested that Plaintiff was committing fraud and advised that the bank would be freezing his account. The bank representative relayed that he had overheard the conversation between the two men regarding payment to Plaintiff

at the bank that day and that "since Chase Bank knew nothing about Mr. Anderson . . . [who] could be a 'fraudulent person or a scammer' . . . [Mr. James] should not deal with Anderson anymore." ECF No. 1 at ¶ 23. Plaintiff avers that Mr. James then explained to the caller that he knew Mr. Anderson well, they were neighbors, and that he was free to do whatever he liked with the money deposited. Plaintiff alleges that the bank then froze Mr. James' account, but the Complaint does not specify for how long.  Mr. James went back to the bank in person, but there is no further information pled regarding what occurred at the bank or when or whether the account was unfrozen. *Id.* at 4-5

Plaintiff's Complaint contains four separate counts: (1) Racial Discrimination and Profiling; (2) Defamation; (3) Disparagement; and (4) Interference with an Advantageous Business Relationship. Plaintiff alleges that Defendant "mis-used its powerful legal right, to freeze the account of Charles James, and did in fact freeze his account as a means of punishing [Plaintiff] by depriving him of his money paid to him by Charles James, for using plaintiff, a black man [] as a Financial Advisor. *Id.* at  ¶ 28. Plaintiff also asserts that Defendant "decided to punish [Plaintiff and Charles James] for daring to Bank at Chase Bank while being Black Men, attempting to deposit and above average amount of $62,000 Dollars therein." *Id.* at  ¶ 27.

Plaintiff alleges that, as a result of Defendants' conduct, he has lost his friendship with Mr. James, who subsequently breached a business contract between the two involving the Miss Black America Pageant. Plaintiff, senior executive producer of the pageant, had contracted with Mr. James to provide recruitment and production services. Plaintiff highlights his contributions to the pageant through the Complaint and includes various newspaper articles about the event and his reputation. *Id.* Plaintiff requests damages of $125,000,000 and $500,000,000 for "misery, pain, anxiety and other devastating adverse impacts." *Id.* at  15.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) requires the court to determine whether the plaintiff's complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). "[M]ere conclusory statements do not suffice." *Id.* When evaluating such a motion, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (*quoting Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). However, "if the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

As Plaintiff Anderson is proceeding pro se, the Court construes his allegations liberally. *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011) (noting that liberal construction of pro se pleadings is "driven by the understanding that '[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training.'" (*quoting Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir.2006)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556). Plaintiff must plead facts to show how Defendant was involved in the facts and circumstances giving rise to her claims, and what those claims specifically are.

### III.    COUNT ONE: RACIAL DISCRIMINATION AND PROFILING

In his Complaint, Plaintiff sets forth a claim for racial discrimination and profiling, alleging that Defendant, "did in fact, racially profile plaintiff, John Anderson's race or his ethnicity as a grounds for suspecting and accusing Plaintiff Anderson, of the criminal offense of fraud, or being a scammer." ECF No. 1 at ¶ 45. Plaintiff's argument is that the bank's reason for accusing him of fraud and freezing Mr. James' account was racially motivated. Plaintiff does not set forth any specific state or federal law in his claim, however, this Court can adduce the laws that may govern by his allegations.

#### A. Potential State Law claims

The principal legislative vehicle in Pennsylvania for assuring the civil rights of all citizens of the Commonwealth is the Pennsylvania Human Relations Act ("PHRA"). The PHRA prohibits discrimination in employment, housing, public accommodations, education, and commercial property based on a persons' sex, religious creed, and race. The statute sets forth, in relevant part:

> The opportunity for an individual to . . .  obtain all the accommodations, advantages, facilities and privileges of any public accommodation  . . . without discrimination because of race, color, familial status, religious creed, ancestry, handicap or disability, age, sex, national origin, . . . is hereby recognized as and declared to be a civil right which shall be enforceable as set forth in this act.

43 Pa. Stat. Ann. § 953. It is an unlawfully discriminatory practice for a:

> lessee, proprietor, manager, superintendent, agent or employee of any public accommodation, resort or amusement to...[r]efuse, withhold from, or deny to any person because of his race, color, sex, religious creed, ancestry, national origin or handicap or disability...any of the accommodations, advantages, facilities or privileges of such public accommodation, resort or amusement."

43 Pa. Stat. Ann. § 955(i)(1). This provision is Pennsylvania's state-law analog to Title II of the Civil Rights Act of 1964, *Levy v. Trent Motel Assocs., LP*, No. 11–776, 2011 WL 3803647, at *7

(E.D.Pa. Aug. 26, 2011), the purpose of which was to "vindicate 'the deprivation of personal dignity that surely accompanies denials of equal access to public establishments,'" *See Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 250, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (quoting S. Rep. No. 88-872, at 16-17 (1964)).

The PHRA supplies a lengthy list of the types of establishments that constitute a "public accommodation, resort or amusement." While the statute itself does not include banking institutions in the definition of "public accommodation," the definition of places of public accommodation is "is broad and all inclusive." *Pennsylvania Hum. Rels. Comm'n v. Alto-Reste Park Cemetery Ass'n*, 453 Pa. 124, 131, 306 A.2d 881, 886 (1973). Pennsylvania courts have invoked section 955(i)(1) to reach discrimination in various places of public accommodation, including a bar that charged patrons different amounts depending upon their gender (*Commonwealth, Pa. Liquor Control Bd. v. Dobrinoff*, 80 Pa.Cmwlth. 453, 471 A.2d 941 (1984)); a bowling league that barred youth bowlers from joining because of their race *(Commonwealth, Human Relations Comm'n v. Loyal Order of Moose, Lodge No. 107,* 448 Pa. 451 (1972); and a cemetery that refused to bury remains depending upon the race of the decedent (*Pa. Human Relations Comm'n v. Alto–Reste Park Cemetery Ass'n,* 453 Pa. 124 (1973)). The Court concludes that a banking institution like Defendant's Chase Bank implicated in this matter does constitution a public accommodation.

However, there are several problems with Plaintiff's claims under the PHRA. First, as Defendant correctly points out, Pennsylvania law requires that a plaintiff exhaust his administrative remedies under the PHRA prior to filing a civil lawsuit. 43 Pa.C.S. § 962(c)(1); *Harrison v. Health Network Lab'ys Ltd., 232 A.3d 674, 683 (Pa. 2020), Woodson v. Scott Paper Co.*, 109 F.3d 913, 925 (3d Cir. 1997). When a claim is filed with the Pennsylvania Human Rights

Commission ("PHRC"), the PHRC has exclusive jurisdiction over the claim for one year after its filing, unless the PHRC resolves the claim before the end of the one-year period. 43 P.S. § 962(c)(1). If after one year the claim has not been resolved, the plaintiff may then file suit in court. *Id.*; *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 471 (3d Cir. 2001). Plaintiff makes no suggestion in his Complaint that he ever pursued any administrative remedies. Therefore, this Court finds that Plaintiff failed to exhaust the administrative prerequisites to filing this action in federal court.

Plaintiff's state law claim would fail for other reasons as well. Plaintiff makes no allegation that Defendant refused to provide him service, in fact, Plaintiff makes clear that he was *already* a customer of the bank. Importantly, this case centers on a third-party transaction with Defendant—Mr. James' efforts to set up a checking account to deposit his lawsuit proceeds and the bank's act of freezing his account. This raises an issue of standing for the Court. Despite Plaintiff's assertion that he was acting as Mr. James' financial advisor, there is no agency relationship present such that Plaintiff could bring suit on Mr. James' behalf.  Moreover, the bank did nothing to prevent Mr. James from opening an account that day—Defendant neither refused service to Plaintiff nor Mr. James.

### B. Potential Federal claims[2]

The inquiry for Plaintiff's potential claims under Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a are substantially similar to the possible state remedy under PHRA proposed by the Court above. Section 2000a provides that:

---

[2] Neither Title II nor Section 1981 of the Civil Rights Act require an individual to exhaust administrative remedies by filing a charge before a government agency and waiting for that charge to be adjudicated or released before proceeding to court.

[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation ... without discrimination or segregation on the ground of race, color, religion, or national origin.

42 U.S.C. § 2000a. Section 2000a claims for refusals to contract for public accommodations based on race require a plaintiff to demonstrate he: (1) is a member of a protected class, (2) attempted to contract for services and afford *himself* the full benefits and enjoyment of a public accommodation, (3) was denied the full benefits or enjoyment of a public accommodation, and (4) such services were available to similarly situated persons outside her protected class who received full benefits or were treated better. *Shumate v. Twin Tier Hosp., LLC*, 655 F. Supp. 2d 521, 537 (M.D. Pa. 2009) (quoting *Slocumb v. Waffle House, Inc.,* 365 F.Supp.2d 1332, 1342 (N.D.Ga.2005) (emphasis added)). For many of the same reasons set forth in Section III (a) supra, Plaintiff has failed to state a claim under Section 2000a. There are no facts alleged to support an assertion that Plaintiff *himself* attempted to exercise "full benefits and enjoyment of a place of public accommodations." This case is about a third-party transaction between Mr. James and Defendant.

Plaintiff's allegations could also be construed as raising a claim under Section 1981 of the Civil Rights Act, which prohibits discrimination on the basis of race, color, and ethnicity when making and enforcing contracts. 42 U.S.C. § 1981(a).  To state and sustain a claim under Section 1981, the plaintiffs must allege and prove (1) that the plaintiff is a member of a racial minority, (2) an intent to discriminate on the basis of race by the defendants, and (3) discrimination concerning one or more of the activities enumerated in the statute, which includes the right to make and enforce contracts. *Brown v. Philip Morris, Inc.,* 250 F.3d 789, 797 (3d Cir.2001). "Make and enforce contracts" is defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual

relationship." *Id.* § 1981(b). Essentially, "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). Additionally, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

It can be adduced from the Complaint that Plaintiff is alleging Defendant interfered with Plaintiff's contractual rights in the following ways: (1) preventing the $7,000 loan repayment by Mr. James to Plaintiff; and (2) inducing Mr. James to breach his agreement to supply Plaintiff services involving the Miss Black America Pageant. From what the Court can gather, it is Plaintiff's contention that Defendant's racial profiling of Plaintiff led the bank to presume fraud, which in turn caused Plaintiff's friend to discontinue their business relationship. Plaintiff never specifically lays out whether he was ever repaid the loan nor does the Complaint spell out what happened after the bank initially froze Mr. James' account. Even accepting as true every fact and inference alleged in the Complaint, Plaintiff has not alleged a claim that is cognizable under Section 1981. It would be a tremendous leap for the Court to infer than the failed transaction caused Mr. James to breach their contract.

As previously discussed, Plaintiff has not sufficiently pled that Defendant engaged in a discriminatory refusal of services or that he, himself, was deprived of the right to contract with the bank. Instead, Plaintiff points to the phone call between Defendant's bank representative and Mr. James, during which Defendant levied an accusation that Plaintiff might be a scammer. By Plaintiff's own admission, the caller based his suspicion on the conversation he overheard between

Plaintiff and Mr. James regarding the debt owed. Plaintiff's allegations fail to establish any evidence that Defendant's actions were motivated by racial animus. Even if Plaintiff has identified injuries flowing from Mr. James' contractual breach with Plaintiff, he cannot show that it was induced by any racially motivated act on the part of Defendant. Because "[c]onclusory allegations of generalized racial bias do not establish discriminatory intent," Plaintiff has not sufficiently pled that Defendant acted with racial animus. *Jones v. School Dist. of Philadelphia,* 19 F.Supp.2d 414, 421 (E.D.Pa.1998), *aff'd,* 198 F.3d 403 (3d Cir.1999)(citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 264–68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)).

## IV.    COUNT TWO: DEFAMATION

Plaintiff's defamation claim alleges that Defendant "lied on [P]laintiff to his friend, and colleague, Charles James, which did cause [P]laintiff to suffer extreme pain, anxiety, and stress." ECF No. 1 at ¶ 47. "Defamation, of which libel, slander, and invasion of privacy are methods, is the tort of detracting from a person's reputation, or injuring a person's character, fame, or reputation, by false and malicious statements." *Joseph v. Scranton Times L.P.,* 959 A.2d 322, 334 (Pa.Super.Ct.2008) (citing *Zartman v. Lehigh County Humane Soc'y,* 333 Pa.Super. 245, 482 A.2d 266, 268 (1984)). The plaintiff's burden of proof in a defamation case is set out in 42 Pa.C.S. § 8343(a):

> *Burden of plaintiff.*—In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:
>     (1) The defamatory character of the communication.
>     (2) Its publication by the defendant.
>     (3) Its application to the plaintiff.
>     (4) The understanding by the recipient of its defamatory meaning.
>     (5) The understanding by the recipient of it as intended to be applied to the plaintiff.
>     (6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

"A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Thomas Merton Ctr. v. Rockwell Int'l Corp.*, 442 A.2d 213, 215 (Pa. 1981). "It is not enough that the victim of the 'slings and arrows of outrageous fortune', be embarrassed or annoyed, he must have suffered that kind of harm which has grievously fractured his standing in the community of respectable society." *Scott-Taylor, Inc. v. Stokes*, 229 A.2d 733, 734 (1967). Thus, for Plaintiffs to prevail, "the statement must do more than merely embarrass or annoy [them]; it must provoke 'the kind of harm which has grievously fractured [their] standing in the community of respectable society.' " *Graboff v. Colleran Firm,* 744 F.3d 128, 136 (3d Cir. 2014) (quoting *Tucker v. Phila. Daily News,* 848 A.2d 113, 124 (Pa. 2004)).

As it relates specifically to the defamatory character of the communication element, the Pennsylvania Superior Count has held that:

> Whether the challenged statements are capable of having a defamatory meaning is a question of law for the court to determine in the first instance. "A statement is defamatory if it tends to harm an individual's reputation so as to lower h[er] in the estimation of the community or deter third persons from associating or dealing with h[er]."
>
> Pennsylvania courts have held that certain types of communications, although undoubtedly offensive to the subject, do not rise to the level of defamation. **For example, expressions of opinion are not actionable.** Likewise, statements which are merely annoying or embarrassing or " 'no more than rhetorical hyperbole' " or " 'a vigorous epithet' " are not defamatory.

*Kryeski v. Schott Glass Technologies, Inc.*, 426 Pa.Super. 105, 626 A.2d 595, 600-01 (1993) (internal citations and quotations omitted) (emphasis added). *See Baker v. Lafayette College*, 516 Pa. 291, 532 A.2d 399, 402 (1987) ("In order for a statement to be considered libelous or slanderous, the trial court must, in the first instance, make a determination as to whether the

communication complained of can be construed to have the defamatory meaning ascribed to it by the complaining party.") (citation omitted).

Plaintiff's defamation claim fails because, even from Plaintiff's version of the facts, the Court cannot conclude that Defendant wasn't reasonably justified in believing that the statement was true. Moreover, the allegedly defamatory statements were presented to Mr. James as a suspicion, which this Court concludes was an expression of the bank representative's personal opinion of Plaintiff based on the interaction he witnessed between the two men. Moreover, the statement about Plaintiff was made by the bank in effort to protect Mr. James, not primarily to defame Plaintiff. Plaintiff cannot overcome the fact that, given the nature of the interaction between Plaintiff and Mr. James at the bank that day, it was reasonable for Defendant to suspect fraud.

While Plaintiff dedicated a great deal of his Complaint laying out his professional accomplishments and reputation in the community, he has not shown that his reputation was damaged by Defendant's statement. Plaintiff alleges that, upon hearing the bank representative's suspicion about Plaintiff, Mr. James defended him, which suggests to the Court that this statement is not to blame for the dissolution of their relationship. There is no allegation that the bank or Mr. James communicated the suspicion of Plaintiff's fraud beyond the telephone communication. Thus, it cannot be said that this statement "provoke[d] the kind of harm which has grievously fractured one's standing in the community of respectable society." *Graboff,* 744 F.3d at 136.

## V.     COUNT THREE: DISPARAGEMENT

Under Pennsylvania law, the elements of commercial disparagement are: (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does result; and (4) the

publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity (actual malice). *See Zerpol Corp. v. DMP Corp.,* 561 F.Supp. 404, 409 (E.D.Pa.1983); *Menefee v. Columbia Broadcasting System, Inc.,* 329 A.2d 216 (Pa.1974); *see also* Restatement (Second) of Torts, § 623A.

Defamation and commercial disparagement are distinct torts, although both involve a false pejorative statement. A claim for commercial disparagement protects economic interests related to the marketability of goods; defamation involves the reputation of persons, not products. *See Zerpol Corp. v. DMP Corp.,* 561 F.Supp. 404, 408 (E.D.Pa.1983).

> The distinction between actions for defamation and disparagement turns on the harm toward which each is directed. An action for commercial disparagement is meant to compensate a vendor for pecuniary loss suffered because statements attacking the quality of his goods have reduced their marketability, while defamation is meant protect [sic] an entity's interest in character and reputation.

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.,* 898 F.2d 914, 924 (3d Cir.1990).

Defendant argues that Plaintiff has failed to "plead appropriate facts establishing some business ownership interest or allege direct pecuniary loss from the statement of Defendant." ECF No 10 at 11. This Court agrees. While Plaintiff argues that he lost Mr. James' assistance in recruiting children to participate in the pageant and "pitch" parents to buy tickets, Plaintiff fails to articulate any specific harm like lost sales or even a general diminution of sales. Furthermore, it is not clear from the Complaint precisely what Plaintiff's business ownership is, if any, over the Miss Black America Pageant.

## VI.    COUNT FOUR: INTERFERENCE WITH AN ADVANTAGEOUS BUSINESS RELATIONSHIP

"The law has long recognized that the wrongful inducing of a breach of contract or the encouragement of one not to enter into a contract or business relationship with another is an actionable tort." *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 207, 412 A.2d 466, 470 (1979)

The Restatement of Torts, s 766 (1939) defines this tort as follows:

> . . . one who, without a privilege to do so, induces or otherwise purposely causes a third person not to
>
>> (a) perform a contract with another, or
>> (b) enter into or continue a business relation with another is liable to the other for the harm caused thereby.

Plaintiff contends that Defendant has interfered with both his existing contractual relationship with Mr. James and with prospective contractual relations. The Court's analysis regarding this claim has largely been discussed in Section III (b), as well as in the discussion of damages in other sections. Plaintiff's Complaint fails to demonstrate that Mr. James was induced to breach his contract with Plaintiff because of Defendant's actions. The Complaint provides nothing more than the unsupported conclusion that Defendant interfered with Plaintiff's business relationships. The Court has liberally construed the facts presented and drawn every *reasonable* inference therefrom, but still concludes that the Complaint is insufficient to support a tort claim for interference.

## V.    CONCLUSION

For all the reasons stated above, Plaintiff fails to plead sufficient facts to support any of his claims (or the Court's proposed causes of action). Therefore, Defendant's motion is granted and the Complaint is dismissed in its entirety.